[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 02-14423

_____

D. C. Docket No. 01-CV-0194-S

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 23, 2003
THOMAS K. KAHN
CLERK

ALABAMA-TOMBIGBEE RIVERS COALITION,
an Alabama nonprofit corporation, PARKER TOWING CO., INC.,
an Alabama corporation, CHARLES A. HAUN, an individual,

Plaintiffs-Appellants,

versus

GALE NORTON, Secretary of the
United States Department of the Interior,
SAM HAMILTON, Regional Director of
the United States Fish and Wildlife Service,
UNITED STATES DEPARTMENT OF THE INTERIOR,
UNITED STATES FISH AND WILDLIFE SERVICE,
an agency of the United States Department
of the Interior, STEVE WILLIAMS, Director of Fish
and Wildlife Service,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(July 23, 2003)**

Before EDMONDSON, Chief Judge, CARNES, Circuit Judge, and STORY[*],
District Judge.

_____

[*]Honorable Richard W. Story, United States District Judge for the Northern District of
Georgia, sitting by designation.

STORY, District Judge:

This case involves a business organization's standing to challenge a decision by the Secretary of the Interior to list the Alabama sturgeon as an endangered species pursuant to the Endangered Species Act of 1973 (ESA), 16 U.S.C. §§ 1531-44. The district court held that Appellants lacked standing and entered summary judgment for Appellees. We reverse and remand.

Appellant Alabama-Tombigbee Rivers Coalition is an Alabama non-profit corporation consisting of sixteen industries, agencies, and associations that rely upon Alabama waterways as integral components of their businesses. Appellant Parker Towing Company ("Parker Towing") is an Alabama corporation and member of the Coalition that uses the Alabama waterways in its towing and barge business. Appellant Charles A. Haun is the Vice President of Parker Towing; he also uses the waterways for recreation.[1] The Coalition filed this suit against Gale Norton, Secretary of the U.S. Department of Interior; Steve Williams, Director of the U.S. Fish and Wildlife Service ("FWS"); Sam Hamilton, Regional Director of the FWS; the U.S. Department of the Interior; and the FWS,[2] alleging that the

---

[1]We refer to Plaintiffs-Appellants collectively as "the Coalition."

[2]We refer to Defendants-Appellees collectively as "the Government."

2

Government unlawfully listed the Alabama sturgeon as an endangered species.[3]

## I. Background

### A. The Endangered Species Act

The ESA "represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation" and provided "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 98 S. Ct. 2279, 2294, 57 L. Ed. 2d 117 (1978); *see also* 16 U.S.C. § 1531(b). The ESA requires the Secretary of the Interior to promulgate regulations listing any species that is threatened or endangered. 16 U.S.C. § 1533. Once a species is listed, various prohibitions attempt to ensure the survival and recovery of that species. *See, e.g.*, § 1536(a)(2) (federal agencies' duty to avoid jeopardizing listed species); § 1538(a) (prohibitions against taking of listed species). The statute imposes the obligation on federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the

---

[3]Appellants originally sued Bruce Babbitt, then-Secretary of the U.S. Department of the Interior, and Jamie Rappaport Clark, then-director of the U.S. Fish and Wildlife Service; following a change in the U.S. Presidential administration, these parties' successors were automatically substituted as defendants. *See* Fed. R. Civ. P. 25(d)(1).

destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical." § 1536(a)(2); *Bennett v. Spear*, 520 U.S. 154, 154, 117 S. Ct. 1154, 1159, 137 L. Ed. 2d 281 (1997). Thus, if an agency determines that its proposed action may adversely affect a listed species or critical habitat, it must formally consult with the FWS or the National Marine Fisheries Service ("NMFS"). § 1536(a)(2); 50 C.F.R. § 402.14 (2002). Additionally, the Regional Director of the FWS or the Assistant Administrator for the National Oceanic and Atmospheric Administration ("NOAA") may request the agency to engage in consultation. 50 C.F.R. § 402.14(a). Finally, consultation shall occur "at the request of, and in cooperation with," a prospective permit or license applicant "if the applicant has reason to believe" that a listed species "may be present in the area affected by his project and that implementation of such action will likely affect such species." 16 U.S.C. § 1536(a)(3).

An agency "action" includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States." 50 C.F.R. § 402.02. This definition expressly includes the granting of permits and licenses, although the consultation requirement is limited to those actions that require "discretionary Federal involvement or control." *Id.*; 50 C.F.R. § 402.03; *see Marbled Murrelet v. Babbit*, 83 F.3d 1068, 1073-75 (9th

4

Cir. 1996) (concluding FWS' advisory activity did not involve discretion so as to trigger consultation requirement). Applicants for federal permits may participate in the consultation process, but they are not required to do so. *See* 50 C.F.R. § 402.14(d) ("The Federal agency shall provide any applicant with the opportunity to submit information for consideration during the consultation.").

Following the consultation process, the FWS must provide a written statement of its opinion detailing how the proposed action will affect the species or its habitat, and suggesting alternatives if it appears the proposed action would jeopardize the species or adversely modify its habitat. 16 U.S.C. § 1536(b)(3)(A). An "incidental take" permit may be issued if the suggested alternatives will minimize injury to the species. § 1536(b)(4). These alternatives may become conditions for applicants to obtain permits or licenses. *Id.*; *see, e.g.*, *Loggerhead Turtle v. County Council of Volusia County*, 148 F.3d 1231, 1240-41 (11th Cir. 1998) (summarizing mitigation measures required as condition of incidental take permit); *Envtl. Coalition of Broward County, Inc. v. Myers*, 831 F.2d 984, 987 (11th Cir. 1987) (upholding Corps' issuance of dredging permit following consultation and noting Corps had imposed eight additional conditions to minimize possible injury to endangered manatee).

**B.  Factual and Procedural Background**

1.  The Alabama sturgeon

The Alabama sturgeon (*Scaphirhynchus suttkusi*) is a small freshwater fish that was historically found only in the Mobile River system of Alabama and Mississippi.  Final Rule to List the Alabama Sturgeon as Endangered, 65 Fed. Reg. 26,438 (May 5, 2000) [hereinafter, *Final Rule*].

> This sturgeon is an elongate, slender fish growing to about 80 centimeters (cm) (31 inches (in)) in length.  A mature fish weighs 1 to 2 kilograms (kg) (2 to 4 pounds (lb)).  The head is broad and flattened shovel-like at the snout.  The mouth is tubular and protrusive.  There are four barbels (whisker-like appendages used to find prey) on the bottom of the snout, in front of the mouth.  Bony plates cover the head, back, and sides.  The body narrows abruptly to the rear, forming a narrow stalk between the body and tail.  The upper lobe of the tail fin is elongated and ends in a long filament.

*Id.*  Although the sturgeon was once so common that it was captured commercially, it is now very rare and thought to occur only in small portions of the Alabama River channel in south Alabama, downstream to the mouth of the Tombigbee River.  *Id.* at 26,439-40.  This decline has been attributed to "over-fishing, loss and fragmentation of habitat due to historical navigation-related development, and water quality degradation."  *Id.* at 26,438.

The FWS initially considered whether to propose listing the sturgeon in

1980.  Review of Three Southeastern Fishes, 45 Fed. Reg. 58,171 (Sept. 2, 1980).

The FWS issued a proposed rule to list the Alabama sturgeon as endangered and to

designate critical habitat in 1993.  Proposed Endangered Status and Designation of

Critical Habitat for the Alabama Sturgeon (Scaphirhynchus suttkusi), 58 Fed. Reg.

33,148 (June 15, 1993).  During the public comment period on the proposed rule,

businesses in Alabama became concerned about the economic impact of the

listing, and the Coalition was formed to review the FWS' scientific and legal

rationales for listing the sturgeon.  The Coalition sued the FWS under the Federal

Advisory Committee Act (FACA), 5 U.S.C. App. 2, and obtained an injunction

against the FWS preventing it from using a report prepared by a scientific

committee that had been improperly convened.  *See generally Alabama-*

*Tombigbee Rivers Coalition v. Dep't of Interior*, 26 F.3d 1103 (11th Cir. 1994)

(setting forth history and affirming district court's entry of permanent injunction)

[hereinafter *Coalition I*].  The FWS withdrew the proposed rule in 1994 because

there was "insufficient information to justify listing a species that may no longer

exist."  Withdrawal of Proposed Rule for Endangered Status and Critical Habitat

for the Alabama Sturgeon, 59 Fed. Reg. 64,794 (December 15, 1994).

The Coalition remained actively involved in scientific studies and

conservation efforts for the Alabama sturgeon even after the FWS withdrew its

proposed listing. In 1996, the Coalition initiated discussions between the FWS, the Army Corps of Engineers (the "Corps"), the State of Alabama, and members of Alabama's congressional delegation that led to a Voluntary Conservation Plan funded by Congress and led by the state. This plan consisted of a captive breeding program that was ultimately unsuccessful. Nevertheless, the Coalition continued to participate in and fund various studies about the species.[4] In 2000, the Coalition again worked with federal and state interests to convert the Voluntary Conservation Plan into a ten-year, eight-million-dollar, formal Conservation Agreement designed to recover the Alabama sturgeon.

Meanwhile, the capture of several Alabama sturgeon confirmed the species' existence, and the FWS issued another proposed rule to list the fish as an endangered species in 1999. Proposed Rule to List the Alabama Sturgeon as Endangered, 64 Fed. Reg. 14,676 (Mar. 26, 1999). After several extensions of the public comment period, the FWS published a final rule listing the Alabama sturgeon as an endangered species. *Final Rule*, 65 Fed. Reg. 26,438.

2. District court proceedings

The Coalition filed this lawsuit under the citizen-suit provision of the ESA,

---

[4]Much of this research was directed to determining whether the Alabama sturgeon is a separate species from the Mississippi shovelnose sturgeon. The FWS has concluded that the two are separate species–a conclusion challenged by the Coalition in this lawsuit.

§ 1540(g)(1), and the judicial-review provisions of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-06, seeking declaratory and injunctive relief and contending that the final rule: arose from an unlawful process; was based on the flawed conclusion that the Alabama sturgeon is a separate species from the Mississippi shovelnose sturgeon; failed to designate critical habitat; violated the Coalition members' Fifth Amendment right to due process; and was not within the powers granted to Congress by the Constitution.

The parties filed cross-motions for summary judgment; the Government argued that the Coalition lacked standing. In response, the Coalition submitted four affidavits. First, John D. Grogan, the Environmental Compliance Manager of Alabama Power Company, which is a member of the Coalition, described the Company's operation of hydroelectric power generating units. Subsequent to the listing of the Alabama sturgeon, the NMFS sought to intervene in Alabama Power's application to amend its license for the Holt Project on the Black-Warrior Tombigbee Waterway. In its Motion to Intervene, the NMFS stated that the Mobile River Basin supports populations of various migrating fish species, including the Alabama sturgeon, and noted that the Holt Project is currently a partial barrier for fish migrations. The NMFS requested that the Federal Energy Regulatory Commission ("FERC") not issue a license amendment until Alabama

Power addressed water quality concerns and implemented mitigation measures. Mr. Grogan averred that Alabama Power expended substantial resources in responding to the Motion to Intervene; moreover, Alabama Power routinely needs to amend or renew its licenses. Thus, he submitted that the company will continue to be injured because the listing provides the NMFS and the FWS the opportunity to seek to change Alabama Power's operation of its hydropower generation units and management of reservoirs. As Mr. Grogan explained, Alabama Power will likely be required to make these changes, or will otherwise expend significant resources opposing them.

Second, Charles Haun, a named plaintiff and the Executive Vice President of Parker Towing, averred that Parking Towing is a full-service marine transportation company that conducts its business in the waterways of Alabama. As he represented, maintenance activities such as dredging are essential to Parker Towing's operations. However, he explained that the FWS' decision to list the Alabama sturgeon as a separate species has caused a "direct, substantial, specific, and present injury" to Parker Towing and the company's ability to timely deliver the products it transports. Because of the consultation requirement, he submitted that there will be delays and conditions imposed on Parker Towing with respect to permits and authorizations for maintenance dredging, including the removal of

10

rock ledges within waterways, which will cause "significant adverse economic consequences for Parker Towing."[5]  Mr. Haun also noted that changes in the operations of locks and dams such as those proposed in the NMFS' Motion to Intervene will directly interfere with Parker Towing's operations.  Finally, Mr. Haun further averred that he is personally interested in the recovery of the sturgeon because he spends time boating in areas of the Warrior River that are likely habitats for the sturgeon.

The third affiant, Ralph O. Clemens, Jr., is the President of the Coalition. He submitted that the listing of the Alabama sturgeon has created the opportunity for the FWS and NMFS to intervene, require consultation, or otherwise participate in various permitting and licensing issues involving members of the Coalition. Mr. Clemens further described the history of the Coalition's involvement in developing the Conservation Agreement and noted that as a result of the listing, the Coalition is forbidden from participating in sturgeon repopulation efforts utilizing the Mississippi shovelnose sturgeon.

Richard J. Oates, the final affiant, is the Executive Director of the Alabama

---

[5]The *Final Rule* noted that "consultation will be required prior to the commencement of any rock shelf removal project within or adjacent to potential Alabama sturgeon habitat."  65 Fed. Reg. at 26,459.  However, it explained that such consultation could be conducted so as to avoid delays in maintenance dredging activities. *Id.*

Pulp and Paper Council, which is a member of the Coalition. As he described, the decision to list the Alabama sturgeon has caused "direct, substantial, specific, and present injuries to the Council . . . ." Like Mr. Clemens, Mr. Oates pointed to the possibility of intervention in permitting issues and the consultation requirement as the impetuses for "adverse interferences with the operations of members of the Council and the Coalition." As an example, he noted that the FWS commented on a member's application for maintenance dredging in light of a threatened species' presence and the proposed listing of the Alabama sturgeon. In its comment letter, the FWS stated that if various management procedures were not put in place, ESA consultation would be required. Mr. Oates further stated that because of the listing of the Alabama sturgeon, members of the Council and Coalition are "having to modify their facilities or alter their operations, . . . or otherwise spend significant resources opposing such modifications or alterations." Indeed, he submitted that "[t]he mere fact that consultation is now required . . . causes members of the Council and the Coalition injury in the form of planning, expenses, costly studies, and project delays."

The district court held that the Coalition had not met its summary judgment burden with respect to standing. The court rejected the Coalition's economic standing argument, noting first that the Coalition's brief in support of its own

12

motion for summary judgment stated that the listing decision "will not impact economic or interstate activities."[6]  Although the Coalition submitted that the opportunity of FWS to intervene would cause planning expenses, costly studies, and project delays, the district court pointed out that the Coalition had provided no evidence of *actual* expenses, studies, or delays.  Emphasizing the Coalition's recognition that the findings set forth in the final rule noted there would be no adverse economic impact, the court reasoned that a bare opportunity for FWS to intervene was inadequate to establish injury in fact.

The district court further explained that "businesses operating along Alabama waterways may be subject to consultation with, or 'interference' from, Federal agencies under numerous environmental statutes, not just the ESA."  Moreover, the district court recognized that the Alabama sturgeon is not the only endangered or threatened species in these waterways.  Based on these circumstances, the district court concluded that the "conjectural threat of the 'opportunity' for economic injury" was insufficient to establish standing.  Addressing NMFS' Motion to Intervene as a particular showing of injury, the court first noted "that there is evidence that the Alabama sturgeon does not exist in

_____

[6]The Coalition made this argument in support of its contention that the listing was not within the scope of authority granted by the Commerce Clause.  For further discussion, see *infra* note 9.

13

the waters surrounding the Holt Lock and Dam Project." Second, the NMFS sought to intervene in Alabama Power's license amendment proceeding pursuant to the Fish and Wildlife Coordination Act, 16 U.S.C. §§ 661-66, although it listed numerous statutes, including the ESA, as additional authority for intervention. Finally, the Motion to Intervene listed five species of diadromous fish, three of which–the Alabama sturgeon, the Gulf sturgeon, and the Alabama shad–are threatened or endangered species. Because numerous statutes and species already enabled the Government to intervene or consult, the district court concluded that the costs expended by Alabama Power were not fairly traceable to the listing decision and would not be remedied by a judgment declaring the listing unlawful and void.

Turning next to the dredging activities and FWS comment letter, the district court emphasized that during the listing process and in the final rule, the Government found that–contrary to the assertions in the letter–the listing of the Alabama sturgeon would not impact navigation and channel maintenance. In light of that finding, the court reasoned that any interference with dredging activities prior to the listing did not support a reasonable inference that FWS would interfere with future dredging activities. Further, the court held that any injury would not be fairly traceable to the listing because, as the FWS letter reflected, the threatened

Gulf sturgeon was also found in the waters covered by the application. Thus, de-listing the Alabama sturgeon would not necessarily remedy the injuries incurred as a result of the Government's interference.

The district court entered summary judgment for the Government, holding that the Coalition, Parker Towing, and Mr. Haun lacked constitutional standing.[7] On appeal, the Coalition asserts several bases for standing. First, the Coalition argues that the district court erred by failing to apply issue preclusion stemming from the standing decisions explicit or implicit in *Coalition I.* Second, the Coalition asserts numerous grounds for constitutional standing in this case: (1) economic standing; (2) environmental, scientific, recreational, and aesthetic standing; and (3) procedural standing. Because we hold that the Coalition has economic standing, we need not consider its other arguments.

## II. Discussion–Article III Standing

Article III of the Constitution confines the reach of federal jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2. This limitation "defines with respect to the Judicial Branch the idea of separation of powers on which the

---

[7]The district court further rejected standing on the basis of the Coalition's sturgeon recovery efforts and Mr. Haun's recreational activities. Because we hold that the Coalition has economic standing, we do not consider whether the recovery efforts or recreational activities provide independent bases for standing. *See Planned Parenthood of the Atlanta Area, Inc. v. Miller*, 934 F.2d 1462, 1465-66 n.2 (11th Cir. 1991) (noting that when one plaintiff has standing to bring all claims in an action, the court need not inquire into the standing of other plaintiffs).

15

Federal Government is founded." *Allen v. Wright*, 468 U.S. 737, 750, 104 S. Ct. 3315, 3324, 82 L. Ed. 2d 556 (1984); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60, 112 S. Ct. 2130, 2136, 111 L. Ed. 2d 695 (1990) (describing how standing interfaces with separation of powers and breadth of judicial power). These values are reflected in the three required elements for constitutional standing:  (1) "an 'injury in fact'–a harm suffered by the plaintiff that is 'concrete' and 'actual or imminent, not 'conjectural' or 'hypothetical;' " (b) "causation–a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant;" and (3) "redressability–a likelihood that the requested relief will redress the alleged injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-04, 118 S. Ct. 1003, 1016-17, 140 L. Ed. 2d 210 (1998); *see also Vt. Agency of Natural Res. v. United States ex rel Stevens*, 529 U.S. 765, 771, 120 S. Ct. 1858, 1861-62, 146 L. Ed. 2d 836 (2000); *31 Foster Children v. Bush*, 329 F.3d 1255, 1263 (11th Cir. 2003).[8]  "When the attack on standing occurs via a

---

[8]Whether a plaintiff has standing " 'involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise.' " *Bennett*, 520 U.S. at 162, 117 S. Ct. at 1161 (quoting *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197, 2205, 45 L. Ed. 2d 343 (1975)).  The Government has not challenged the Coalition's standing on prudential grounds. *See id.* at 162-66, 117 S. Ct. at 1161-63 (reversing Court of Appeal's determination that plaintiffs seeking to prevent application of environmental restrictions and protect their business lacked standing under the zone-of-interests test to bring claims under the ESA citizen-suit provision). Nor has the Government challenged the Coalition's standing as a membership organization, which requires three additional elements:  "(1) its members must otherwise have standing to sue in their own right; (2) the interests it seeks to protect must be germane to the organization's

motion for summary judgment, the plaintiffs can no longer rest on their allegations, but must set forth by affidavit or other evidence specific facts which for the purpose of summary judgment will be taken as true." *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 806 (11th Cir. 1993) (internal quotations omitted); *see also Lujan*, 504 U.S. at 561, 112 S. Ct. at 2137. Whether a plaintiff has standing to bring a suit is a legal issue that we review de novo. *Region 8*, 993 F.2d at 806.

## A. Injury in Fact

The parties do not dispute that harm to economic interests presents a cognizable injury for purposes of standing. *Bennett*, 520 U.S. at 167-68, 117 S. Ct. at 1163-64; *see also Clinton v. City of New York*, 524 U.S. 417, 433, 118 S. Ct. 2091, 2100, 141 L. Ed. 2d 393 (1998) (recognizing probable economic injury resulting from governmental actions that alter competitive conditions as sufficient to satisfy Article III injury-in-fact requirement); *Clark v. City of Lakewood*, 259 F.3d 996, 1007 (9th Cir. 2001) (holding adult entertainment business's alleged financial loss as result of city ordinance was sufficient to establish injury in fact); *Adams v. Watson*, 10 F.3d 915, 921 (1st Cir. 1993) ("While the project is not yet

---

purpose; and (3) neither the claim asserted nor the relief requested must require the participation of the association's individual members." *Region 8 Forest Serv. Timber Purchasers v. Alcock*, 993 F.2d 800, 805 n.3 (11th Cir. 1993).

completed, and hence specific proof of competitive injury is not possible, it could hardly be thought that administrative action likely to cause harm cannot be challenged until it is too late." (internal quotations omitted)); *cf. Lujan*, 504 U.S. at 562-63, 112 S. Ct. at 2137 ("the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing"). The Government contends, however, that the Coalition has not produced evidence showing that the economic injuries of its members are sufficiently concrete and imminent to confer standing here.

The "injury in fact" element of Article III standing does not require a plaintiff to wait until an injury occurs to bring suit. *31 Foster Children*, 329 F.3d at 1265. However, the injury must be imminent–not abstract, hypothetical, or conjectural. *Lujan*, 504 U.S. at 560, 112 S. Ct. at 2136. Imminence, while an "elastic concept," requires that "the injury proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all." *Id.* at 565 n.2, 112 S. Ct. at 2138-39 n.2. In *31 Foster Children*, we elaborated on the concept of immediacy for purposes of considering allegations of future injuries. 329 F.3d at 1266. There, foster children sued the administrators of Florida's foster care system, seeking prospective relief with respect to, *inter alia*, their claims for the substantive due process rights to

18

safe care and prompt services and First, Ninth, and Fourteenth Amendment rights to family associations. *Id.* at 1261-62. The administrators argued that most of the plaintiffs failed to allege either a palpable risk of injury or imminent harm; instead, the defendants contended, the plaintiffs complained mainly of past harms. *Id.* at 1265. We concluded that the plaintiffs in the defendants' physical custody had standing with respect to the substantive due process claims, as did the plaintiffs who were in the defendants' physical custody with siblings for the associational claims. *Id.* at 1266. We reasoned that the plaintiffs were in the defendants' care involuntarily and could not avoid exposure to the challenged conduct. *Id.* The alleged future injuries were similar to an injurious policy, rather than being conjectural injuries whose occurrences were premised on a past random act. *Id.* Indeed, we concluded that the "alleged pattern and practice in this case presents a substantial likelihood that the alleged injury will occur." *Id.*

Similarly here, the Coalition is operating against the backdrop of a continuing policy that was triggered by the listing and is effectuated by the machinery of the ESA. While the Coalition's evidence of past events such as the FWS' intervention and the comment letter might by itself be insufficient to establish standing for prospective relief, in this context the evidence illustrates what is apparent from a review of the ESA: the listing has injured the Coalition's

19

members and will continue to do so. *Cf. City of Los Angeles v. Lyons*, 461 U.S. 95, 105, 103 S. Ct. 1660, 1667, 75 L. Ed. 2d 675 (1983) (reasoning plaintiff lacked standing to pursue injunctive relief stemming from one-time traffic stop and choking incident). Messrs. Grogan, Haun, and Oates have all indicated that Coalition members operate their businesses subject to federal licenses and permits; the Government does not dispute that portions of the members' licensed or permitted activities take place in historical Alabama sturgeon habitat. It is reasonable to infer from the Coalition's evidence that its members have settled expectations with respect to the viability of their businesses–expectations that the members intend to guard not in the speculative future, but constantly. The listing adds another layer of concrete economic considerations that may be in tension with the members' pre-listing assumptions. Indeed, all of the affiants averred that Coalition members are now modifying their facilities, altering their operations, or expending resources to oppose such modifications; further, they stated that the consultation requirement is causing Coalition members injury in the form of planning, studies, and delays. The Coalition need not present "detailed descriptions" of actual expenses, as the district court would have required. *Lujan*, 504 U.S. at 565 n.2, 112 S. Ct. at 2138 n.2 (internal quotations omitted). Where standing is premised on future injury, "its imminence (*though not its precise*

20

*extent*) must be established." *Id*. (emphasis added).[9] We therefore conclude that the Coalition presented sufficient evidence for purposes of summary judgment to show "injury in fact."

## B. Traceability

The Government also contends that the Coalition cannot meet the second and third prongs of the standing test. The showing of traceability must not be too "attenuated," *Allen v. Wright*, 468 U.S. at 757, 104 S. Ct. at 3328, but "the indirectness of the injury does not necessarily deprive the person harmed of standing." *Warth*, 422 U.S. at 505, 95 S. Ct. at 2208. Nevertheless,

> [w]hen . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed. . . . The existence of one or more of the essential elements of standing depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or predict . . . it becomes the burden of the plaintiff to

---

[9]We further reject the notion that the Coalition's Commerce Clause argument, which emphasized the FWS' conclusions that the listing would not have a significant economic impact, constituted a judicial admission. Legal arguments are distinguishable from judicial admissions. *See Z.J. Gifts D-4, L.L.C. v. City of Littleton,* 311 F.3d 1220, 1233 (10th Cir. 2002) (declining to treat counsel's legal interpretation of ordinance as judicial admission); *see also Continental Ins. Co. of N.Y. v. Sherman*, 439 F.2d 1294, 1298 (5th Cir. 1971) (refusing to apply judicial admission rule strictly where it conflicted with Federal Rules of Civil Procedure allowing inconsistent pleading). Further, it is conceivable that a government action could have local economic impacts without affecting interstate commerce.

> adduce facts showing that those choices have been or will be made in such a manner as to produce causation and permit redressability of injury.

*Lujan*, 504 U.S. at 562, 112 S. Ct. at 2137 (internal citations and quotations omitted); *see also Tenn. Valley Auth. v. E.P.A*, 278 F.3d 1184, 1205 (11th Cir. 2002), *op. withdrawn in part by* – F.3d –, 2003 WL 21452521 (11th Cir. June 24, 2003).

The Supreme Court has explained that the "fairly traceable" requirement does not necessitate "injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett*, 520 U.S. at 168-69, 117 S. Ct. at 1164; *see also Tenn. Valley Auth. v. E.P.A.*, 278 F.3d at 1207. Indeed, economic injuries "produced by determinative or coercive effect upon the action of someone else" are distinguishable from those that are merely a result of independent actors not before the court. *Id.*

This case is unlike those in which a plaintiff sues in an attempt to change the behavior of a party not before the court such as *Allen v. Wright.* In *Allen*, the plaintiffs challenged the IRS' grant of tax exemptions to racially discriminatory schools. 468 U.S. at 757, 104 S. Ct. at 3328. The Supreme Court reasoned that the plaintiffs' injury–a diminished ability to receive a desegregated education–was

22

a result not of the IRS' policies, but of decisions by independent actors such as school officials and parents who were not before the Court. *Id.* at 758, 104 S. Ct. at 3328. These points were made more apparent in the Court's redressability analysis: it was "entirely speculative" whether a withdrawal of the tax exemptions would cause a private school to change its discriminatory policies. *Id.* It was similarly speculative whether parents would withdraw their children from these schools and place the children in public schools as a result of a withdrawal of tax exemptions. *Id.* Further, it was not at all clear that "in a particular community, a large enough number of the numerous relevant school officials and parents would reach decisions that collectively would have a significant impact on the racial composition of the public schools." *Id.*

The circumstances here are more akin to those in *Bennet v. Spear.* There, ranch operators and irrigation districts challenged a biological opinion issued by the FWS because it induced the Bureau of Reclamation to limit the amount of irrigation water available to the plaintiffs. 520 U.S. at 167, 117 S. Ct. at 1163. Although the Bureau of Reclamation was not a party before the Court, the Supreme Court reasoned that the FWS' biological opinion had "a powerful coercive effect." *Id.* at 169, 1164. Given the procedural mandates of the ESA, the biological opinion "alter[ed] the legal regime to which the agency action [was]

subject." *Id.*; *see also Tenn. Valley Auth. v. E.P.A.*, 278 F.3d at 1207 (holding that traceability was met for power companies' standing where TVA's compliance with EPA's orders would result in diminished energy reserves imposing greater costs on power companies).

Here, the Coalition's injuries are produced by the coercive effect of the ESA as implemented by the FWS or NMFS: federal agencies *and* Coalition members must at least consider whether consultation is necessary for their activities. This point is particularly evident in light of the possibility of the Coalition's members running afoul of the "take" prohibition if they or acting agencies fail to consider the Alabama sturgeon at all with respect to their activities in its historical habitat.[10] For these reasons, we cannot accept the Government's argument that consultation is voluntary because any costs expended by the Coalition are costs it has chosen to expend. The ESA establishes a framework that is coercive rather than voluntary. The Coalition's affidavits provide evidence that its members are already incurring planning expenses as a result of the listing, illustrating the necessary causal link.

Although there are already other listed species within the waterways in which the Coalition's members operate, the entire framework of the ESA,

---

[10]The Coalition does not argue that its standing arises from any likely violations of the "take" prohibition. However, we think the Coalition's evidenced activities in the context of the full ESA backdrop are important considerations for this standing analysis.

including the consultation provisions, requires species-specific conservation. *See, e.g.*, 16 U.S.C. § 1536(A)(2) ("[e]ach Federal agency shall . . . insure that any action . . . is not likely to jeopardize the continued existence of *any* endangered or threatened species" (emphasis added)). To hold that there is no causation because of the presence of other species would be to ignore this central theme of the ESA. Moreover, the four affidavits point specifically to the Alabama sturgeon as the cause of the economic injuries; drawing all reasonable inferences in favor of the non-moving party, as is required at the summary judgment stage, we conclude that the Coalition has provided sufficient evidence of traceability.

## C. Redressability

Similarly, the Coalition has submitted sufficient evidence showing redressability. As an initial matter, we note that "[w]hile redressability must not be speculative, it need only be 'likely,' not certain." *Tenn. Valley Auth. v. E.P.A.*, 278 F.3d at 1207. The Coalition seeks a declaration that the Government violated the ESA and APA, which would invalidate the listing. Even though other listed species could trigger the consultation requirement and other statutes could authorize the Government to intervene in permitting matters, these arguments are "insufficient to justify a conclusion that this Court could not redress the injury." *Id.* The traceability of the injury is focused on the marginal impact of the unique

25

species *Scaphirhynchus suttkusi*; so too is the injury redressable because delisting the sturgeon will eliminate the additional considerations of which the Coalition complains. Accordingly, we hold that the Coalition does not lack standing in this case.

## III. Conclusion

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND the case for proceedings consistent with this opinion.