[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 5, 2003
THOMAS K. KAHN
CLERK

_____

No. 01-16973

_____

D.C. Docket No. 00-00542 CV-PCH

ROBERT S. WOLFF,
EDWARD TURNER,
EDWARD E. WALLER,
GREY WOLF HOLDINGS,
JOHN G. COUGHLIN,

Plaintiffs-Appellees,

versus

CASH 4 TITLES,
d.b.a. Charles Richard Homa, et al.,

Defendants,

PHILLIP S. STENGER,
G. JAMES CLEAVER, CAYMAN
ISLANDS LIQUIDATIONS CREDITOR'S COMMITTEE,

Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 5, 2003)

Before TJOFLAT and BARKETT, Circuit Judges, and WEINER[*], District Judge.

TJOFLAT, Circuit Judge:

I.

This appeal involves the fairness of the attorneys' fees the district court

awarded the plaintiffs' attorneys in a class action brought under the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964,[1] by the

victims of a Ponzi scheme.[2] The Ponzi scheme involved the sale of securities of

_____

[*]Honorable Charles R. Weiner, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

[1] Section 1964(c) of title 18 provides, "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." Sections 1962 (a), (b), and (c), in turn, make criminally liable those who engage in, or aid and abet another to engage in, a pattern of racketeering activity or the collection of an unlawful debt if they also do the following: invest income derived from the pattern of racketeering activity or the collection of an unlawful debt in the operation of an enterprise engaged in interstate commerce (section 1962(a)); acquire or maintain, through the pattern of racketeering activity or the collection of an unlawful debt, any interest in or control over such an enterprise (section 1962(b)); or conduct, or participate in the conduct of, the affairs of such an enterprise, as a person employed by or associated with the enterprise, through a pattern of racketeering activity or the collection of an unlawful debt (section 1962(c)). Section 1962(d) makes it a crime to conspire to violate sections 1962(a), (b), or (c).

[2] The expression "Ponzi scheme" has become common parlance for fraudulent investment plans in which funds taken from later investors are paid to early investors to create the false appearance that investment activities are generating high returns. The expression takes its name from Charles Ponzi, a famous Boston swindler. Beginning with just $150 in capital in late 1919, Ponzi initiated an investment scheme in which he promised 150% returns on 90-day promissory notes. Ponzi claimed that revenue from the notes would be used to finance profitable investments in the international trade of postal coupons. In fact, Ponzi never invested the funds at all and simply used revenues from new investors to pay off notes purchased by earlier investors, including himself. In only eight months, Ponzi had collected close to $10 million from the scheme. See Cunningham v. Brown, 265 U.S. 1, 7-9, 44 S. Ct. 424, 425-26, 68 L. Ed. 873 (1924) (detailing Ponzi's fraud scheme).

corporations formed for the purpose of making high-interest loans to members of the public, who would pledge their automobile titles as collateral. The named plaintiffs and the members of their class are the purchasers of these securities; the defendants are the issuer corporations and those entities and individuals who devised or facilitated the scheme.

The plaintiffs' complaint, which was filed in the Southern District of Florida on February 8, 2000, alleged that the defendants fraudulently misrepresented that the proceeds of the securities the plaintiffs purchased would be used to fund the loans that were to be collateralized with the automobile titles, because the defendants' intent was, instead, to divert most of the proceeds to their own uses. Such fraud and the defendants' misappropriation of investment proceeds, the plaintiffs alleged, violated the federal mail fraud,[3] wire fraud,[4] and money laundering statutes,[5] constituted "racketeering activity" under RICO,[6] and rendered the defendants liable in treble damages.

During their investigation of the matter, the plaintiffs' attorneys concluded

---

[3] 18 U.S.C. § 1341.

[4] 18 U.S.C. § 1343.

[5] 18 U.S.C. §§ 1956-57.

[6] 18 U.S.C. § 1961.

3

that some of the funds obtained from the plaintiffs had passed through various bank accounts in the United States and the Bank of Bermuda (Cayman) Limited ("Bank"). Counsel concluded that the Bank had aided and abetted the defendants in their perpetration of the alleged fraudulent scheme and, thus, was answerable with the defendants in RICO damages. Counsel therefore amended the plaintiffs' complaint to add the Bank as a party defendant.

Several months later, on June 16, 2001, plaintiffs' counsel and the Bank arrived at a settlement and entered into an agreement which called for the Bank to pay the members of the plaintiff class $67.5 million in exchange for releases of liability and the dismissal of the plaintiffs' claims.[7] Under the agreement, the Bank would deposit this amount with Phillip S. Stenger, who, acting as the administrator of the settlement ("Settlement Administrator"), would pay the class plaintiffs' claims. After the parties submitted the Settlement Agreement to the district court for approval, the court held a fairness hearing. No one objected to the settlement, and the court therefore approved it. Four days later, on October 16, 2001, the court entered an order dismissing the plaintiffs' claims against the Bank

---

[7] The Bank, its parent corporation, Bank of Bermuda, Ltd., and Bermuda Trust (Cayman) Ltd. were parties to the settlement. In this opinion, our reference to the "Bank" includes the parent corporation and the trust. Also executing the settlement agreement was Phillip S. Stenger, who agreed to dismiss a lawsuit, which we describe in the text infra, that he had brought against the Bank in the United States District Court for the Northern District of Illinois, Stenger v. Bank of Bermuda, No. 00-CV-5740 (filed Sept. 19, 2000).

with prejudice in a final judgment entered pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

The Settlement Agreement provided that the fees for the plaintiffs' attorneys would be paid out of the $67.5 million settlement fund.  The court entered the final judgment (dismissing the claims against the Bank) without fixing counsel's fees; apparently with the consent of the parties, the court deferred ruling on counsel's fee application.[8]  The court ruled on counsel's fee application at the conclusion of a four-day hearing in which it heard from the plaintiffs' attorneys; members of the plaintiff class; counsel for the Securities and Exchange Commission ("SEC"), which, as indicated below, was prosecuting a suit against the defendants other than the Bank in the Northern District of Illinois;[9] and the appellants.  After considering what they had to say, the court, on November 9, 2001, awarded plaintiffs' counsel fees in the sum of $11.475 million, which amounted to seventeen percent of the settlement fund.

---

[8] Plaintiffs' counsel initially asked for fees equal to 25% of the $67.5 million settlement. They subsequently amended their application to request a fee of 23.5%.  The record does not indicate why the court did not dispose of the amended application before entering the Rule 54(b) final judgment; we assume that time constraints made it inconvenient for the court to rule on the application at the fairness hearing.

[9] Securities and Exchange Commission v. Homa, No. 99-CV-6895 (N.D. Ill. filed Oct. 21, 1999).  As indicated in the text infra, prior to the settlement of the instant case, Phillip S. Stenger (the settlement administrator) was appointed receiver of the assets of the defendants named in Homa (who, with the exception of the Bank, are defendants in the instant case).

Phillip S. Stenger, as "Receiver," two "Joint Official Liquidators" ("JOLs") of Cayman Islands companies,[10] and the Cayman Islands Liquidations Creditors' Committee ("Creditors' Committee")[11] now appeal the district court's attorneys' fee decision.[12] In a joint brief, they ask us to vacate the district court's fee award as excessive and to remand the case for further proceedings. The plaintiffs' attorneys, as appellees, ask us to dismiss this appeal on the ground that none of the appellants has standing to prosecute it.

We conclude that the appellants lack standing to appeal and therefore dismiss the appeal without reaching the question of whether the district court abused its discretion in awarding the attorneys' fees at issue. Before setting forth the reasons for our conclusion, we think it appropriate to explain the various hats Phillip S. Stenger wears in this case, as "Receiver," as "Settlement Administrator," and as "JOL."

On October 21, 1999, the SEC brought a lawsuit in the United States District Court for the Northern District of Illinois against the defendants (with the

_____

[10] Stenger is one of the two JOLs; thus, in addition to appealing as "Receiver," he appeals as a JOL.

[11] The Creditors' Committee consists of four members of the plaintiff class who, according to their brief, serve as a "conduit" between the members of the plaintiff class and the JOLs.

[12] The SEC appears as amicus curiae, in support of Stenger's position.

6

exception of the Bank) named in the instant action; its complaint described the same Ponzi scheme described in the complaint in the instant case and sought relief under Section 17(a) of Securities Act of 1933,[13] Sections 10(b), 15(a)(1) and 15(c)(1) of the Securities Exchange Act of 1934,[14] and Rule 10b-5 of the SEC's regulations.[15] Securities and Exchange Commission v. Homa, No. 99-CV-6895. On November 2 and December 10, 1999, the district court, with the consent of the defendants' attorneys, entered orders granting the SEC's application for the appointment of a "receiver of the Receivership Property" of each of the defendants "for the benefit of investors to marshal, conserve, protect, hold funds, operate and, with the approval of the Court, dispose of any assets constituting the Receivership Property." The Receivership Property included all of the defendants' assets. The two orders appointed Phillip S. Stenger as the receiver and gave him the authority to "bring such legal actions based on law or equity in any state, federal or foreign court as he deems necessary or appropriate in discharging his duties as receiver on behalf of the estate [of the defendants] or on behalf of investors whose interests he

---

[13] 15 U.S.C. § 77q(a).

[14] 15 U.S.C. §§ 78j(b), 78o(a)(1), 78o(c)(1).

[15] 17 C.F.R. § 240.10b-5.

is protecting."[16]  The orders also authorized him to employ his law firm, Stenger &

Stenger, P.C., of Grand Rapids, Michigan, to represent him.[17]  In March 2000, the

Grand Court of the Cayman Islands appointed Stenger and G. James Cleaver of the

Ernst & Young accounting firm as the JOLs of the Cayman Islands companies

involved in the Ponzi scheme.  On September 19, 2000, Stenger, acting as

Receiver of Cash 4 Titles (a defendant in the instant case), sued the Bank in the

United States District Court for the Northern District of Illinois, Stenger v. Bank

of Bermuda, No. 00-CV-5740.  Pending the Bank's motion to dismiss the action,

the proceedings, including discovery, were stayed.  Stenger settled the case,

releasing the Bank from the receivership's claims, as part of the settlement

agreement the Bank made with the class plaintiffs on June 16, 2001.  With this

history in mind, we address the plaintiffs' attorneys' motion to dismiss this appeal.

---

[16]  As we indicate in part II.B of the text, infra, although he was Receiver of the assets of the defendants (with the exception of the Bank) in the instant case, Stenger made no attempt to appear in the case on behalf of any of these defendants – either as Receiver or as counsel for the defendants.

[17]  Stenger thereafter employed Stenger & Stenger, P.C., to represent him as Receiver. The firm is one of four law firms on appellants' joint brief in this appeal.  The brief's cover sheet indicates that Stenger & Stenger, P.C., represents "Cash 4 Titles," one of the defendants in the case.  Neither Stenger & Stenger, P.C., nor any other law firm or attorney appeared or filed a pleading on behalf of Cash 4 Titles in the district court.  As far as we can tell, this is Cash 4 Title's first appearance in the instant action.  The joint brief's Certificate of Interested Persons states as follows: "Phillip S. Stenger, Esq. (Appellant/Receiver/Joint Liquidator/Cayman's Creditors' Committee)"; "Stenger & Stenger, P.C. (Counsel for Appellant/Receiver)."  Two other law firms, Holland & Knight, LLP, and Silver & Van Essen, P.C., are also listed in the Certificate of Interested Persons as "Counsel for Appellant/Receiver."

II.

A.

"Article III of the Constitution confines the reach of federal jurisdiction to 'Cases' and 'Controversies.'" Alabama-Tombigbee Rivers Coalition v. Norton, 338 F.3d 1244, 1252 (11th Cir. 2003) (quoting U.S. Const. art. III, § 2).

> The irreducible constitutional minimum of standing contains three requirements. First and foremost, there must be alleged (and ultimately proved) an injury in fact – a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical. Second, there must be causation – a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant. And third, there must be redressability – a likelihood that the requested relief will redress the alleged injury. This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence.

Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 102-04, 118 S. Ct. 1003, 1016-17, 140 L. Ed. 2d 210 (1998) (citations and marks omitted). In addition to these three constitutional requirements, the Supreme Court has held that prudential requirements pose additional limitations on standing. For example, "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement . . . the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Seldin, 422 U.S. 490, 499, 95 S. Ct. 2197,

2205, 45 L. Ed. 2d 343 (1975).

Litigants must establish their standing not only to bring claims, but also to appeal judgments. Arizonans for Official English v. Arizona, 520 U.S. 43, 64, 117 S. Ct. 1055, 1067, 137 L. Ed. 2d 170 (1997) ("The standing Article III requires must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." (citations and marks omitted)). Though similar and overlapping, the doctrines of appellate standing and trial standing are not identical. See Knight v. Alabama, 14 F.3d 1534, 1555 (11th Cir. 1994). "The primary limitation on [a litigant's] appellate standing is the adverseness requirement which is one of the rules of standing particular to the appellate setting. Only a litigant 'who is aggrieved by the judgment or order may appeal.'" Id. at 1556 (quoting Dairyland Ins. Co. v. Makover, 654 F.2d 1120, 1123 (5th Cir. Unit B. Sept. 4, 1981)). Thus, it is entirely possible that named defendants in a trial proceeding, who would doubtless have appellate standing for the purposes of challenging some final rulings by the trial court, could lack standing to appeal other trial court rulings that do not affect their interests.

"Generally, one not a party lacks standing to appeal an order in that action."

Taylor v. Ouachita Parish School Bd., 648 F.2d 959, 971 (5th Cir. Unit A 1981).[18]

But see In re Subpoena to Testify Before Grand Jury Directed to Custodian of Records, 864 F.2d 1559, 1561 (11th Cir. 1989) (acknowledging that nonparties can sometimes *intervene* to appeal a judgment that would abridge another's protected speech when those intervenors are potential recipients of the speech).

B.

Although several class members objected to plaintiffs' counsel's 23.5% fee petition at the trial level, not a single class member appealed the final 17% fee award ultimately issued. Instead, the appellants consist of Stenger, the JOLs, and the Creditors' Committee. None of them were parties before the district court; none moved the court for leave to intervene in the case for any purpose. When plaintiffs' counsel learned that Stenger planned to contest their fee application and attempted to discover the materials he might introduce at the hearing on their application, Stenger objected on the ground that he was not a party in the litigation and hence was not subject to discovery under Rule 34 of the Federal Rules of Civil Procedure. Because he was not a party, Stenger argued that to obtain the materials, counsel had to serve him with a subpoena under Rule 45, which

_____

[18] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

11

provides procedures for obtaining testimony or the production of potential evidence from nonparties. The JOLs, moreover, in a document filed with the district court, specifically identified themselves as "non parties in this action."

In sum, if appellants became parties in this case, they became such solely because they voiced objections to the fees plaintiffs' attorneys were seeking or because one of them was the receiver for defendants other than the Bank. We conclude that neither of these circumstances made the appellants parties in this case. "[T]he district court has great latitude in formulating attorney's fee awards." Gilmere v. City of Atlanta, 931 F.2d 811, 814 (11th Cir. 1991). In its discretion, the court could have permitted innumerable sources to inform its judgment, regardless of whether those sources were proper parties with a legal *right* to object. Thus, the objections alone do not indicate party status. Furthermore, there is no reason to suppose that Stenger automatically became a party to the class action lawsuit merely by virtue of his role as the defendants' court-appointed Receiver in a separate action.[19] See, e.g., 65 Am. Jur. 2d Receivers § 394 (2003)

---

[19] In oral argument, appellants's counsel suggested that we treat Stenger as a party defendant, "as receiver for the defendant entities in the class action." We are not persuaded. Nothing in appellants' brief warranted the suggestion that a defendant's receiver is necessarily a proxy for the defendant in a case. Various sources hold, to the contrary, that receivers have legal identities distinct from the entities whose assets they are charged with marshaling. See, e.g., 65 Am. Jur. 2d Receivers § 365 (2003) ("Generally, a receivership does not prevent the commencement or prosecution to judgement of actions against the person of whose property the receiver is appointed and such an action cannot be enjoined."); Seaboard Air Line Ry. Co. v.

12

("The receiver does not, by virtue of his or her appointment, become a party to a pending action against the corporation or person for whose property the receiver is appointed, but is a stranger to the action until added or substituted by an order of the court wherein the action is pending."). Stenger has consistently represented himself as a receiver, not as a representative of the respective defendant entities. He has not been substituted for any defendant as a party, and there is no intimation that he appears for the defendants now in this appeal.[20] Because this case provides

---

Dorsey, 149 So. 759, 760 (Fla. 1932) ("The rule is well settled that the appointment of a receiver for the defendant does not abate an action against it nor will it bar the prosecution to judgment of such action. If the interests represented by the receiver render it necessary he may at his request be substituted by order of the court as a party defendant and allowed to defend, but until this is done he is a stranger to the cause. It is not the duty of the plaintiff to bring him in."). Indeed, in Riehle v. Margolies, 279 U.S. 218, 49 S. Ct. 310, 73 L. Ed. 669 (1929), the Supreme Court acknowledged that a state court could litigate a lawsuit brought against a defendant that became subject to federal receivership proceedings. The Court distinguished between two aspects of orders involving the distribution of a defendant's assets among its creditors. One aspect, it explained, "deals directly with the property" to be distributed by fixing "the time and manner of distribution." Id. at 224, 49 S. Ct. at 312. This direct-property aspect, the Court suggested, implicates the defendant's receiver. The second aspect "does not deal directly with any of the property," but deals instead with defendant's "amount of indebtedness" to creditors, i.e., the defendant's liability. Id., 49 S. Ct. 312-13. This liability aspect implicates the defendant itself. "There is no inherent reason," the Court explained, "why the adjudication of the liability of the *debtor in personam* may not be had in some court other than that which has control of the res." Id. at 224, 49 S. Ct. at 313 (emphasis added). It follows, then, that, in the instant case, the liability of the defendants in personam for RICO damages was a matter to be adjudicated without the Receiver's presence. The Receiver's interest would be implicated only after the plaintiffs' obtained a money judgment and sought to execute their judgment against the defendants' assets.

[20] The cover of appellants' brief indicates that Stenger's law firm is appearing for Cash 4 Titles (one of the defendants in the case for which counsel never appeared in the district court, see supra note 17), but Stenger himself has never appeared as a party or as counsel of record for a party.

13

no reason to depart from the usual rule against appeals by nonparties, see Taylor, 648 F.2d at 971, we find that the appellants lack standing to appeal the district court's fee award.

In any event, the appellants lack injury sufficient to satisfy the requirements of Article III. This shortcoming would deprive appellants of standing even if, contrary to all appearances, they were non-settling parties to the trial proceeding. In other contexts, we have recognized that "a non-settling defendant . . . is not prejudiced by the settlement and therefore has no standing to complain about the settlement." In re Beef Industry Antitrust Litigation, 607 F.2d 167, 172 (5th Cir. 1979). On the facts of this case, none of the appellants is responsible for paying the plaintiffs' attorneys' fees; none would suffer any imaginable concrete injury if those fees were increased, nor would they enjoy any concrete benefit if those fees were eliminated altogether. Instead, these hypothetical injuries or benefits would accrue to the class members themselves. The class members proved themselves capable of objecting to the fees at trial, and they elected not to appeal the fee award before this court. The appellants have no legal basis for waging a battle that the allegedly injured class members elected not to pursue.

Appellants' inventive attempts to squeeze an injury out of the fee award underscores the fault of their position. Appellants' first argument, presented in

their joint brief, is founded on the principle that the class members cannot recover twice for the same injuries; thus, every dollar the Bank pays to compensate the defrauded investors is a dollar for which the other defendants cannot be liable. Extrapolating from this principle, appellants argue that Stenger, as Receiver for the other defendants, is injured insofar as the receivership entities are subject to greater residual liability for every settlement dollar disbursed to the plaintiffs' lawyers instead of the class members themselves. This argument's Achilles' heel is its fatally questionable assumption that the class members' recovery – for purposes of prohibiting double recovery from defendants other than the Bank – is measured as $67.5 million less the attorneys' fees, rather than as the whole amount the Bank pays out to settle the claims against it. Appellants fail to provide any support in the record or law for this assumption. The fact of the matter is that the class members receive two assets from the Bank's settlement: cash compensation for their injuries and valuable legal services. The Bank ultimately financed both of these assets in exchange for releases from suit. There is absolutely no reason to suppose that the Bank has paid less or that the receivership entities remain liable for more simply because a percentage of the Bank's payout is allocated to attorneys' fees.

Although appellants do not identify Stenger qua Settlement Administrator

15

as a co-appellant, they argue that in that capacity he is injured by the fees because greater fees mean that fewer funds come into his custody for distribution among the class members. This red herring fails to swim around the fact that the Settlement Administrator is simply that: an administrator who performs nothing more than a mechanical function in distributing funds for the court. Under the Settlement Agreement, Stenger must deposit the funds in an interest-bearing bank account, "separate from the other Receivership assets." He has no duty or even discretion to deposit the funds in a higher-yielding investments; in fact, he has no choice but to place the funds at a bank in Illinois or Michigan. He must disburse pro rata payments to the class members based on their claims against the Bank, and he has no discretion to vary the percentage of recovery awarded among class members.[21] Even within this narrow range of responsibility, the Settlement Administrator's activities are subject to the court's supervision.[22] All interest

---

[21] In relevant part, the Settlement Agreement provides,
A class member's "Settlement Share" of the Net Settlement Fund equals the lesser of (a) 50% of the member's Recognized Loss [defined, roughly, as the amount loaned to the fraud scheme less any sums recovered from it]; or (b) the product of the Settlement Fund remaining after payment of the Receiver's expenses . . . multiplied by a fraction, the numerator of which is a class member's Recognized Loss, and the denominator which is the sum of all Recognized Losses of all class members.

[22] The Settlement Agreement specifies that any disputes concerning the Receiver's administration of the fund or payment of its shares to the class members are "subject to review by the Receivership Court (Judge Guzman)" in the Northern District of Illinois. How settling parties in a case pending before a judge of the Southern District of Florida could charge a judge

16

accrued on the settlement fund pending distribution accrues to the plaintiffs, not Stenger. With respect to his own compensation, Stenger is entitled to nothing more for his services than reimbursement "for fees, costs and expenses incurred in connection with the administration" of the settlement fund. This reimbursement, like all other aspects of the settlement administration, is subject to court approval. There is no reason to suppose, and appellants do not argue, that the Administrator's reimbursement will vary in proportion to the size of the fund after the plaintiffs' attorneys' fee has been deducted. Finally, as Settlement Administrator, Stenger will hold only the "Net Settlement Fund," which is defined in the Settlement Agreement as the Bank's total payout less the fees awarded to the plaintiffs' attorneys. Thus, the Agreement does not entrust Stenger with a specified sum from which fees will be withdrawn; rather, Stenger's role as Settlement Administrator begins only where attorneys' fees have already been determined and disbursed. On the facts of this case, then, it is clear that the Settlement Administrator is not injured, irrespective of the fee amount paid to the plaintiffs' attorneys.

---

in another district with monitoring the execution of their settlement – which the Southern District judge not only approved, but in so doing specified in its final order (pursuant to which judgment issued) that it "retained exclusive jurisdiction to resolve any issues regarding the interpretation, validity, effect or enforceability of the Settlement or this Order" – somehow escapes us. We are delighted that this conundrum is not before us in this appeal.

Appellants also suggest that their standing can be traced to a provision in the Settlement Agreement specifying that the "Class Plaintiffs and the Settling Defendants agree not to object to the Receiver's standing to raise any concerns before the Class Action Court"[23] regarding various matters, including the plaintiffs' attorneys' fee. However well intended, however carefully negotiated, this provision cannot affect our jurisdiction. Parties cannot, by agreement or otherwise, confer jurisdiction on a court. See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702, 102 S. Ct. 2099, 2104, 72 L. Ed. 2d 492 (1982) ("[N]o action of the parties can confer subject-matter jurisdiction upon a federal court."). Clearly, the provision does not imbue the Receiver with a contractual right to oppose the fee award. It simply contains the class plaintiffs' promise not to raise standing concerns in the event of opposition to the fee award. Whether breach of this promise creates standing in the Receiver to bring a collateral contract action against the plaintiffs' attorneys is not an issue before us.

Finally, appellants contend that the plaintiffs' attorneys waived their standing challenge by failing to assert it at the trial level. This contention

---

[23] "Settling Defendants" appears in the plural because the Bank for purposes of this discussion refers to three affiliated entities. See supra note 7.

18

proceeds in two steps. First, appellants attempt to characterize the plaintiffs' attorneys' standing objection as one grounded solely in the prudential bar to asserting third-party rights. Second, appellants urge us to hold that prudential standing objections, unlike Article III standing objections, are waivable. This legalistic gambit grossly misconstrues the doctrine of standing. The requirement of injury to the complaining party stems from Article III, not from prudential principles.

> The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally. A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered "some threatened or actual injury resulting from the putatively illegal action . . . ."

Warth, 422 U.S. at 499, 95 S. Ct. at 2205 (quoting Linda R.S. v. Richard D., 410 U.S. 614, 617, 93 S. Ct. 1146, 1148, 35 L. Ed. 2d 536 (1973)). Thus, even in exceptional cases where plaintiffs are permitted to raise the rights of others, those plaintiffs must still demonstrate their own injuries to satisfy the constitutional requirements of standing. See id. at 501, 95 S. Ct. at 2206 ("Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules. Of course, Art. III's requirement remains: the plaintiff still must allege a distinct and palpable injury to himself . . . ."). As explained above,

19

appellants' standing is questionable not because they assert third-party rights to rectify their injuries, but because they lack injuries altogether. Since this failing amounts to a jurisdictional infirmity, challenges based on it cannot be waived.

> [W]e are required to address the issue [of standing] even if the courts below have not passed on it, and even if the parties fail to raise the issue before us. The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines.

FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 230-31, 110 S. Ct. 596, 607, 107 L. Ed. 2d 603 (1990) (citations, marks, and brackets omitted). We need not address the question of whether purely prudential standing arguments are waivable.

## IV.

For the foregoing reasons, this appeal is

DISMISSED.